## James, Appellant, *v.* Penn Tanning Company.

*Contract—Written contract—Vagueness of terms—Unenforceable memorandum.*

A memorandum in writing relating to a sale or exchange of bark or timber, is not enforceable as a contract, where it appears that no parties are mentioned in the writing on which it is to be binding, that no time is stated for the beginning or ending of the alleged contract, that there is no definite area of land described from which timber is to be taken, nor any fixed amount of bark to be delivered for purposes of exchange, that the paper does not show that the minds of the parties ever came together on any specific thing, and that evidence apart from the paper shows that the memorandum was intended merely as the basis upon which to make a formal contract.

Argued May 4, 1908. Appeal, No. 319, Jan. T., 1907, by plaintiffs, from judgment of C. P. Warren Co., June T., 1904, No. 18, on verdict for plaintiffs in case of H. J. James and T. S. James, trading as James Brothers now for use of James Brothers Lumber Company, v. Penn Tanning Company. Before Fell, Brown, Mestrezat, Elkin and Stewart, JJ. Affirmed.

Assumpsit on an alleged contract.

The writing or memorandum in controversy was in the following form :

" H J James of James Bros was here on Jay 21, '95 I told him that we would pay 5.75 pr 2200 lbs for Bark Loaded on P & W Jo Jo Jnct fr 1895 Peeling Somewhere about 3000 to

4000 Cord that we would pay them 4.00 pr Cord & the timber from a Cord of Bark Bark Del Same place or 4.50 & the timber from a Cord of Bark delivered on the T V R R and take no timber than what is on the Crawford Lands and that we would not peel until 4 years from now when we could commence peeling at the rate of 3000 to 4000 Cords pr year. All Deliveries of bark to be in the Summer option with us peel Sooner than four years the James Bros are to take this proposition into Consideration.

"Agred upon 3–29–95."

LINDSEY, P. J., charged as follows:

This action is brought by the plaintiffs, H. J. James and T. S. James, former partners doing business as James Brothers now for the use of James Brothers Lumber Company, a corporation organized under the laws of Pennsylvania, against the Penn Tanning Company, for the purpose of recovering alleged damages for what the plaintiffs claim is a breach of contract, and also to recover a balance which the plaintiffs claim to be due them for hemlock bark which the plaintiffs delivered to the defendant.

The alleged contract on the part of the plaintiffs, that is, the terms of the alleged contract, was first talked about on January 21, 1895, according to the evidence of the plaintiffs. It was either on that date or January 22, and Mr. H. J. James states that he went to Sheffield and in the office of the Penn Tanning Company he had a talk with Mr. Jerry Crary, the president of the Penn Tanning Company. Mr. James states that their talk and negotiations resulted in coming to terms in relation to the plaintiffs delivering a certain quantity of bark to the defendant, and the price was agreed upon, Mr. James stated, for which Mr. Crary, as president of the Penn Tanning Company, was to cut and peel the bark on a quantity of timber which was then standing and growing upon lands called the Crawford lands. And according to the terms, which Mr. James stated was agreed upon between himself and Mr. Crary, Mr. Crary was to pay $4.00 per cord in cash for the bark which Mr. James was to deliver at a station called Jo Jo on the P. & W. R. R., and was to credit the plaintiff with $1.50 per cord on the timber which was to be delivered from the Crawford

property to the plaintiffs, and he was to pay $4.50 per cord for bark delivered on the T. & V. R. R., and credit $1.50 on the timber to be delivered from the Crawford property.

Now Mr. James states that Mr. Crary made a memorandum of this understanding between them, that it was talked over, but Mr. James states that he did not want to agree to it positively until he had consulted his partner. He went home and consulted his partner and claims that he and his partner came back on March 29, 1895, and that they had further talk about it, and that a copy was made, Mr. James stated, of the memorandum which Mr. Crary had made, which copy is produced in evidence in this case.

Now it is alleged on the part of the plaintiffs that the negotiation there had constituted an agreement between the plaintiffs and defendant in relation to this bark and timber, and in accordance with the terms of the memorandum which has been given in evidence.

[We say to you, gentlemen of the jury, that Mr. Crary, as president of the Penn Tanning Company, did not have authority in our opinion, to bind the Penn Tanning Company in a contract for the property mentioned in this memorandum and property in question here.] [1]

It is claimed also on the part of the plaintiffs that if this contract was not binding between the parties because of a lack of authority on the part of the president, Mr. Crary, to make such a contract, without the consent or direction of the board of directors of the Penn Tanning Company, that it was ratified afterwards. And they have introduced testimony which they claim is sufficient to show a ratification on the part of the defendant corporation.

[We feel bound to say to you that, in our judgment, the evidence is not sufficient to show a ratification, and is not sufficient, in our judgment, to submit to the jury of the ratification. And, without now entering into the evidence to point out the lack of testimony, we so instruct you. And we say to you that there was no valid contract in our judgment made between the parties there which would entitle the plaintiffs to recover damages; and the plaintiffs have not shown evidence sufficient to submit to the jury of a ratification of any contract.] [2]

But the evidence shows that the plaintiffs have delivered a large quantity of bark which the defendant company has had the benefit of and the use of, and in our opinion the defendant is bound to pay for the amount of bark, if the defendant has not already done so, and to pay for it according to the price named in this memorandum. We think that the question was talked over between the plaintiffs, the two brothers—James Brothers—and Mr. Crary, the president of the Penn Tanning Company, and these prices named in the memorandum were settled upon as the prices; whether or not it was a contract made between them in view of the fact that the matter was not put in writing in accordance with what some of the evidence shows—I think Mr. James himself testified that it was to be put in writing—irrespective of that we think that the prices were settled upon in such a way that the Penn Tanning Company ought to pay for the bark received and which the defendant received the benefit of, in accordance with these prices.

[The plaintiffs claim in their statement of claim a balance of $4,321.07 due them on the amount of bark which they have delivered to the defendant. And we say to you on this branch of the case the plaintiffs are entitled to recover. This amount is not disputed by the defendant. There is no dispute in the testimony relating to this part of the plaintiffs' claim, and, therefore, the plaintiffs will be entitled to your verdict for that amount, with interest from the date of bringing of this suit.] [3, 4]

The interest has been figured and added to the amount which I gave you, and it amounts to $4,969.15 and the clerk will take your verdict for that amount.

Verdict and judgment for plaintiffs for $4,969.13, for the amount of bark actually delivered. Plaintiffs appealed.

*Errors assigned* were (1–4) above instructions, quoting them.

*Alex. Simpson, Jr.,* with him *H. E. Fish, D. I. Ball* and *J. E. Mullin,* for appellants.—Having for years received the benefit of the contract, defendant cannot now be permitted to repudiate it, when by the changes in market values it has become onerous: Penna. Nat. Gas Co. v. Cook, 123 Pa. 170;

Manhattan Hardware Co. v. Phalen, 128 Pa. 110; Bucklin v. Davidson, 155 Pa. 362.

*John G. Johnson*, with him *C. H. McCauley* and *Hinckley, Rice & Alexander*, for appellee.—The defendant contends that there never was any agreement between the plaintiffs and the defendant company, or with Jerry Crary, individually or as president of the Penn Tanning Company : Brown v. Finney, 53 Pa. 373; Maitland v. Wilcox, 17 Pa. 231; Sparks v. Pittsburg Co., 159 Pa. 295; Leskie v. Haseltine, 155 Pa. 98.

OPINION BY MR. JUSTICE ELKIN, June 2, 1908 :

This is an action of assumpsit to recover for the breach of an alleged contract for the sale or exchange of hemlock timber and bark. The defendant corporation is extensively engaged in the operation of tanneries, and the legal plaintiffs were, and the use plaintiff is, engaged in the lumber business. The tanning company needed bark and the lumber people wanted to sell bark, and perhaps purchase timber. This was the situation of the parties at the time negotiations began about the subject-matter of this controversy. Crary was the president of the Penn Tanning Company and had the general management of its business at the time the alleged contract was entered into. In the first clause of the amended statement of claim, it is averred that the defendant on or.about March 29, 1895, entered into an agreement with the James Brothers whereby defendant agreed to cut, fell and peel the hemlock trees upon what was known as the Crawford lands, containing about 4,700 acres, and to exchange the timber and logs taken therefrom suitable for sawing, for hemlock bark to be delivered by the James Brothers, at the price and upon the conditions agreed upon between the parties as to amounts and deliveries. At the trial the burden was on the plaintiff, first, to establish a valid contract, then to prove performance, or proffer to perform, and still further to show refusal on the part of defendant to perform amounting to a breach. The plaintiff undertook to meet the burden resting on it by offering in evidence a memorandum made by Crary on January 21, 1895, upon which were indorsed in the handwriting of James these words : " Agreed upon 3-29-95." The memorandum was not

signed by Crary, or James, nor did it contain any mention of the Penn Tanning Company, nor did it purport to be, at the time of making, an executed contract on the part of anyone. It is not pretended that any officer, authorized to do so, had at any time formally executed the alleged contract in the name of the Penn Tanning Company, or indeed that any person, either as an officer of the corporation or as an individual, had executed the memorandum of agreement by signing his name. The memorandum, the very foundation upon which the right to recover depends, and without which there can be no recovery in this case, does not contain the name of the defendant corporation, was not executed by any officer of the tanning company, either with or without authority as and for its corporate act and deed, or indeed in any other manner, nor was anything done up to the time when it is asserted there was an acceptance to show on its face that the tanning company was in any manner connected with it, unless such connection should be inferred from the fact that it had to do with hemlock bark and trees. It is apparent the memorandum was very hastily drawn. Its meaning is, to say the least, doubtful, and if there are mutual covenants, against whom are they to be enforced? This cannot be determined from the writing. What do they mean? This is uncertain. How much bark was to be delivered on one side, and how many trees or how much timber on the other, is not stated, nor, in our opinion, can these material matters be determined with any legal certainty from the instrument relied on, considered in its parts or as a whole. After careful consideration, we have concluded the memorandum is too vague, indefinite and uncertain in its terms, to be specifically enforced, and that an action for an alleged breach cannot be sustained. In our opinion, there is no escape from this conclusion, and for the following reasons: First, no parties are mentioned in the agreement upon which it is to be binding. No individual, firm, partnership or corporation signed the agreement, nor does the memorandum itself, or the evidence produced at the trial, show that it was ever authorized to be executed. It never was finally executed by anyone. The memorandum begins with a declaration that a Mr. James was here on a certain date and that the writer had said to him, " I told him that we would pay " certain prices. Who " I " was

and who is meant by "we" is not explained in the writing, nor does anything appear on its face, which in any manner explains what parties are to be bound thereby, and certainly not the slightest reference is made to the appellee company. Second, no time is mentioned for the beginning or ending of the alleged contract, and nothing definite is provided as to the length of time during which the sale or exchange of hemlock timber for bark is to continue, unless, as is suggested, the duration of the contract is to be determined by the number of cords of bark produced, but the measurement of time by the cord is unknown to the calendar and is too indefinite in law to determine the legal rights of parties under the facts of the present case. Third, the subject-matter of the alleged agreement is indefinite and uncertain as to amounts and areas. There is no definite area of land described from which timber is to be taken, nor is there any fixed amount of bark to be delivered for purposes of exchange. If the transaction amounted in contemplation of law to a sale of standing timber, not for immediate severance, then under the rule of all our cases, it would be real estate, and a bare reference to the Crawford lands would be insufficient in point of description to make a valid contract under the statute of frauds, but independently of this consideration, it cannot be, that a reference in the memorandum which says to "take no timber than what is on the Crawford lands" can be construed as a binding covenant to cut, fell and peel the hemlock timber on several thousand acres of land. The provision that no timber was to be included in the exchanges than such as should be taken from the Crawford lands does not mean that all the timber from all the Crawford lands must be so exchanged. What the parties evidently intended, and what was subsequently done, was that timber cut from the Crawford lands from time to time was exchanged for bark delivered at various times as suited the purpose and convenience of the parties. The slight reference to the Crawford lands in the memorandum of agreement falls far short of an express covenant to sell or exchange all the trees on all of the tracts of land. Fourth, the memorandum does not show that the minds of the parties ever came together on any specific thing, and certainly it cannot be pretended that the Penn Tanning Company by any corporate action authorized such an

agreement in writing to be entered into. Indeed, the memorandum on its face, the subsequent correspondence between the parties, and the proven facts clearly show that the parties intended a formal contract to be executed at a later date, which was never done. The memorandum relied on is lacking in almost all of the essential elements of a contract. It was not intended as an executed agreement, as clearly appears from letters which passed between the parties in November and December, 1896, and in January, 1897, showing that almost two years after making the alleged agreement upon which appellant relies to recover, both parties had the understanding, and so declared in writing, that the contract had never been executed. This no doubt explains why the memorandum was so vague, indefinite and uncertain. It was intended as the basis upon which to make a formal contract in which the amount of bark to be furnished, and the extent of lands to be included, and other material matters, should be expressly stipulated. This was never done, and the understanding between the parties, whatever it was, can only legally be determined by the vague and indefinite writing set up in this case, and perhaps to some extent by what the parties did under it, but, in any event, the memorandum itself, or the acts of the parties under it, would not justify a court in holding as a matter of law that the appellee had covenanted to sell, or exchange, all the hemlock timber on all the Crawford lands, or that it had agreed to accept an unlimited and indeterminate supply of bark from appellant, indefinite as to time of delivery and without reference to whether it was to be furnished from timber then owned by appellant or to include all that might be subsequently acquired. The letter of the lumber company addressed to the tanning company, dated August 4, 1897, and the answer of the tanning company of the same date, would seem to conclusively show that both parties understood their arrangement, whatever it was, only to apply to bark owned by the lumber company, and did not apply to such as might be purchased from other parties by appellant. From all these facts and circumstances, it seems perfectly clear that the parties never did finally execute a definite contract, nor was anything ever done to fix the amount of bark to be furnished on one side and timber on the other, nor was it ever determined to what

exact areas the proposed agreement should apply, but, in the absence of an express contract, the parties, taking the memorandum as a basis as to prices and deliveries, proceeded to make exchanges of timber and bark for a period of years, expecting no doubt at some time to execute a contract fixing amounts and defining areas, which was never done, and the courts cannot do for them what they have failed to do for themselves.

From what has been hereinbefore said, it is clear that the judgment of the court below must be affirmed, and we do not deem it necessary to discuss the other assignments of error. But this must not be understood to mean that we disagree with the conclusion reached by the learned trial judge in the consideration of this case on other points. Independently of the question whether the president of the corporation could bind it under the facts of this case, or whether the alleged contract was subsequently ratified by the corporation, we hold that the memorandum of agreement is too vague, indefinite and uncertain to be enforced against the appellee company to the extent of compelling the sale or exchange of all the trees on all the tracts of land mentioned in the statement of claim, and since there was no obligation to sell or exchange all the trees or timber on all the lands, under the facts of this case there was no breach for which damages can be recovered.

Judgment affirmed.